**BURSOR & FISHER, P.A.**
L. Timothy Fisher (CA Bar No. 191626)
Yeremey Krivoshey (CA Bar No. 295032)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
          ykrivoshey@bursor.com

**BURSOR & FISHER, P.A.**
Max S. Roberts (*Pro Hac Vice*)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: mroberts@bursor.com

*Class Counsel*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KARLA MAREE and MOURAD GUERDAD, on behalf of themselves and all others similarly situated,<br><br>                                   Plaintiffs,<br><br>    v.<br><br>DEUTSCHE LUFTHANSA AG,<br><br>                                   Defendant. | Case No. 8:20-cv-00885-SVW-MRW<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND RESPONSE TO CASTANARES OBJECTIONS**<br><br>Date    July 10, 2023<br>Time:   1:30 p.m.<br>Courtroom:  10A<br>Judge: Hon. Stephen V. Wilson |

1
2

**TABLE OF CONTENTS**

PAGE(S)

3

I.    INTRODUCTION ........................................................................................ 1

4
5
6

II.   THE COURT HAS ALREADY RULED AGAINST
      CASTANARES ON VIRTUALLY EVERY ISSUE RAISED IN
      THE OBJECTIONS ................................................................................ 4

7
8

III.  CASTANARES' "NEW" OBJECTIONS ARE WITHOUT
      MERIT ................................................................................................ 13

9

      A.    The $500,000 Minimum Floor Is Reasonable ...................................... 13

10

      B.    The Notice Was The Best Practicable .................................................. 16

11
12

      C.    Motion for Attorneys' Fees Was Served 14 Days Prior To
            Objection Deadline .......................................................................... 18

13

IV.   CONCLUSION ...................................................................................... 18

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1
2

# TABLE OF AUTHORITIES

PAGE(S)

3

**CASES**

4
5

*Asghari v. Volkswagen Grp. of Am., Inc.*,
   2015 WL 12732462 (C.D. Cal. May 29, 2015) ....................................................... 2

6
7

*Boeing Co. v. Van Gemert*,
   444 U.S. 472 (1980) ...................................................................................................... 8

8
9

*Davis v. Brown Shoe Co., Inc.*,
   2015 WL 6697929 (E.D. Cal. Nov. 3, 2015) ..................................................... 15

10

*Flores v. Alameda County Indus. Inc.*,
   2015 WL 3763605 (N.D. Cal. June 16, 2015) .................................................. 15

11
12

*Hartless v. Clorox Co.*,
   273 F.R.D. 630 (S.D. Cal. Jan. 20, 2011) .......................................................... 15

13
14

*In re Facebook Biometric Information Privacy Lit.*,
   522 F. Supp. 3d 617 (N.D. Cal. 2021) ................................................................. 1

15
16

*In re Google Inc. Street View Electronic Comms. Lit.*,
   21 F.4th 1102 (9th Cir. 2021) ............................................................................... 14

17
18

*In re Linkedin User Priv. Litig.*,
   309 F.R.D. 573 (N.D. Cal. 2015) .......................................................................... 1

19
20

*In re Online DVD-Rental Antitrust Litig.*,
   779 F.3d 934 (9th Cir. 2015) ................................................................................. 1

21

*Mandukano v. Basic Vegetable Prods. Inc.*,
   541 F.2d 832 (9th Cir. 1976) ................................................................................. 2

22
23

*Mangone v. First USA Bank*,
   206 F.R.D. 222 (S.D. Ill. Feb. 2, 2001) ............................................................... 2

24
25

*Maree v. Deutsche Lufthansa AG*,
   2023 WL 2563914 (C.D. Cal. Feb. 13, 2023) ........................................... passim

26
27

*Miller v. Ghirardelli Chocolate Co.*,
   2015 WL 758094 (N.D. Cal. Feb. 20, 2015) .................................................... 15

28

*Ontiveros v. Zamora*,
　303 F.R.D. 356 (E.D. Cal. Oct. 8, 2014)..................................................15

*Perkins v. Linkedin Corp.*,
　2016 WL 613255 (N.D. Cal. Feb. 16, 2016).........................................15

*Rodriguez v. West Publishing Corp.*,
　563 F.3d 948 (9th Cir. 2009).......................................................................1

*Rosales v. El Rancho Farms*,
　2015 WL 4460918 (E.D. Cal. July 21, 2015) .......................................14

*Shames v. Hertz. Cop.*,
　2012 WL 5392159 (S.D. Cal. Nov. 5, 2012) ............................................2

*Six (6) Mexican Workers v. Arizona Citrus Growers*,
　904 F.2d 1301 (9th Cir. 1990)............................................................7, 14

*Van Gemert v. Boeing Co.*,
　739 F.2d 730 (2d Cir. 1984).......................................................................7

*Willcox v. Lloyds TSB Bank, plc*,
　2017 WL 487018 (D. Haw. Feb. 6, 2017) .............................................15

*Zepeda v. PayPal, Inc.*,
　2017 WL 1113293 (N.D. Cal. Mar. 24, 2017)........................................1

I.    **INTRODUCTION**

In a class of 165,098 people, 21,356 have timely submitted claims. Declaration of Dana Boub Regarding Notice to the Class, ECF No. 212, at ¶ 5 ("Boub Decl."). That is an astounding 12.9 percent claims rate, far superior to most consumer class actions.[1] Of the 21,356 claims, 18,429 have submitted claims for $10 cash, 1,941 have submitted claims for $45 vouchers, and 985 have submitted claims for full refunds plus 1% interest. *Id.* With these claims in mind, Lufthansa will have to pay out the following under the Settlement:

$500,000 Minimum Floor for $10 cash, $45 voucher, and 1% interest claims;

$1,789,163.85 in Full Refunds[2]

$182,324 in notice and claims administration expenses[3]

$4,000 in Incentive Awards ($2,000 each to the named Plaintiffs)

$875,000 in Attorneys' Fees, Costs, and Expenses (assuming Court approval)

That amounts to $3,350,487.85, or just shy of the $3.5 million minimum valuation of this claims-made Settlement. *See Maree v. Deutsche Lufthansa AG*, 2023 WL

---

[1] *See* FED. TRADE COMM'N, CONSUMERS AND CLASS ACTIONS: A RETROSPECTIVE AND ANALYSIS OF SETTLEMENT CAMPAIGNS 11 (2019) ("Across all cases in our sample requiring a claims process, the median calculated claims rate was 9%, and the weighted mean (*i.e.*, cases weighted by the number of notice recipients) was 4%."); *see also*, *e.g.*, *In re Facebook Biometric Information Privacy Lit.*, 522 F. Supp. 3d 617, 622 (N.D. Cal. 2021) (noting that claims rate of 22 percent "vastly exceeds the rate of 4-9% that is typical for consumer class actions"); *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 967 (9th Cir. 2009) (finding claims rate of 13.8 supported a finding of a "favorable reaction to the settlement among class members"); *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 944-45 (9th Cir. 2015) (affirming approval of settlement where less than 3.4% of class members filed claims); *Zepeda v. PayPal, Inc.*, 2017 WL 1113293, at *16 (N.D. Cal. Mar. 24, 2017) (finding that the "reaction of the Settlement Class is favorable" with a 2.8% claims rate.); *In re Linkedin User Priv. Litig.*, 309 F.R.D. 573, 589 (N.D. Cal. 2015) (approving a roughly 6% claims rate with few objections or opt-outs).
[2] The average ticket cost $1,816.41, multiplied by 985 claims, equals $1,789,163.85. *See* Declaration of Yeremey O. Krivoshey In Support of Plaintiffs' Motion for Final Approval of Class Action Settlement And Motion for Attorneys' Fees, Costs, and Expenses, and Incentive Awards, ECF No. 208 at ¶ 15 (calculating average ticket price of $1,816.41).
[3] *See* Boub Decl. ¶ 7.

2563914, at *11-12 (C.D. Cal. Feb. 13, 2023) ("In considering the amount offered to the class, the Court must also consider attorney's fees, incentive awards, and administrative costs.").  Given that this case had extreme litigation risks, and failure written all over class certification and summary judgment, the result is extraordinary. Indeed, as has been extensively briefed, the result is likely orders of magnitude higher than class members could have achieved at trial.

Against the background of this overwhelming support from Class Members, only two putative class members have objected, and 11 have opted out.  Boub Decl. ¶ 3, 4 (referring to "one" objection, consisting of the objection of Jana and Dennis Castanares, which was submitted jointly); Jana and Dennis Castanares Objection to Class Action Settlement, ECF No. 209 ("Castanares Objection").  That is an objection rate of .0012 percent, and an opt-out rate of .0067.  The near universal support for the Settlement amongst class members is a strong reason to approve the Settlement and overrule the two objectors.  *See Shames v. Hertz. Cop*., 2012 WL 5392159, at *8 (S.D. Cal. Nov. 5, 2012) ("The Ninth Circuit has held that the number of class members who object to a proposed settlement is a factor the Court may consider in its settlement approval analysis.") (citing *Mandukano v. Basic Vegetable Prods. Inc*., 541 F.2d 832, 837 (9th Cir. 1976)); *id*. at *8 ("The absence of a large number of objectors supports the fairness, reasonableness, and adequacy of the settlement."); *Asghari v. Volkswagen Grp. of Am., Inc*., 2015 WL 12732462, at *24 (C.D. Cal. May 29, 2015) ("The comparatively low number of opt-outs and objectors indicates that generally, class members favor the proposed settlement and find it fair."); *Mangone v. First USA Bank*, 206 F.R.D. 222, 227 (S.D. Ill. Feb. 2, 2001) (noting in a claims-made settlement case with over 100 objections that the "opt-out and objection statistics show that 99.99% of the Settlement Class elected to take part in the Settlement.  In evaluating the fairness of a class action settlement, such overwhelming support by class members is strong circumstantial evidence

1   supporting the fairness of the Settlement.").

2          Given this case's history, and the Castanares objectors' counsel's multi-year

3   campaign to derail the Settlement, it is now abundantly clear that the real "objectors"

4   are Castanares' *counsel*, and not class members themselves.  Amazingly, the two

5   plaintiffs in *Castanares, et al v. Deutsche Lufthansa AG*, Case No. 2:20-cv-4261-

6   MWF-MRW – plaintiffs Anthony Castanares and Kristin Sullivan – *do not object*.

7   Instead, Castanares' counsel has apparently recruited their family members to file

8   objections for strategic reasons.  *See* Castanares Objection at 13 (stating that

9   objectors are "family member[s]" of the plaintiffs in the *Castanares* action).  Given

10  that 99.99 percent of class members have elected to remain in the settlement class or

11  have affirmatively filed claims, the Court should recognize that the Castanares'

12  objectors' point of view is not shared amongst the settlement class.  Failing to

13  approve the Settlement would just result in more of the very harm that the settlement

14  class eagerly wishes to avoid, more delay in getting compensation for cancelled

15  Lufthansa flights.

16         Castanares' hodgepodge of objections, presented in 22 bulleted points without

17  citation to a single docket entry or case cite, is just a repeat of arguments that this

18  Court has already rejected in granting preliminary approval.  *See* Castanares

19  Objection, at 8-12.  Castanares also cites three new "additional objection[s]" – *i.e.*,

20  those objections that the Court has not yet overruled.  *See id*. at 12-15.  But the

21  "new" objections fare no better.  For instance, Castanares' "new" objection about the

22  purported unfairness of the $500,000 Minimum Floor has already been rejected by

23  this Court.  *See* Anthony Castanares, Kristin Sullivan and Jana Castanares'

24  Opposition to Defendant Deutsche Lufthansa AG's Ex Parte Application for

25  Modification of the Preliminary Approval Order; ECF No. 200 (where the

26  Castanares plaintiffs, and non-party – and current objector Jana Castanares –

27  objected to the $500,000 Minimum Floor); Amended Order Granting Preliminary

28

Approval of Class Action Settlement, ECF No. 203, at 9 ¶ 26 (approving the $500,000 Minimum Floor). Castanares' objection regarding notice has no merit, cites nothing in the record, and cites no caselaw whatsoever. Both objectors did in fact submit claims and did in fact receive notice. The extremely robust claims rate in this case shows that the notice plan, as approved by the Court and executed by the claims administrator, was not "designed in a way to discourage customers from submitting claims." Castanares Obj. at 14. Indeed, the claims rate was 2.5-4 times higher than the "3% to 5%" claims rate anticipated by the *Castanares* Plaintiffs' expert in opposition to Plaintiffs' motion for preliminary approval. *See* Declaration of Christopher Longley, ECF No. 118-19, at ¶ 27. The key inquiry, in any case, was whether notice was the best practicable under the circumstances, and it was. Castanares' final "new" objection that class members purportedly did not receive at least 14 days to object or opt out after the filing of Plaintiffs' motion for attorney's fees has been entirely mooted, as the Court extended the objection and opt-out deadlines until 14 days after Plaintiffs' motion was actually filed. *See* Order Granting Plaintiff's Unopposed Ex Parte Application for Continuing the Class Member Objection and Opt Out Deadlines, ECF No. 211.

## II.    THE COURT HAS ALREADY RULED AGAINST CASTANARES ON VIRTUALLY EVERY ISSUE RAISED IN THE OBJECTIONS

The vast majority of Castanares' brief raises arguments that this Court has already rejected in granting preliminary approval. Indeed, Castanares does not even attempt to frame them as "new" arguments, but instead just incorporates its various previous briefs whole cloth, and then provides a bulleted list of prior points without citation to evidence or the record. *See* Castanares Objection at 7-12.

In the introduction, Castanares also shows that they do not understand the Settlement or its benefits. For instance, Castanares argues that customers that have not yet received a refund will only receive $16,325 in interest, and that those that

have already received a refund will receive $177,120 in cash and $85,230 in vouchers, for a total of $278,675.  *Id*. at 4, 6.  That is not correct.  These class members will receive a total of $500,000 the Minimum Floor, almost double the amount calculated by Castanares.  Castanares argues that these amounts are not sufficiently high by making identical (and obviously wrong) merits and damages arguments and calculations that this Court has already rejected.  *See id*. at 4-6; *Maree*, 2023 WL 2563914, at *11-12 ("As noted in the Court's previous order, the Court agrees with the Maree Plaintiffs and Lufthansa that the Castanares Plaintiffs' estimates are too high.  Among the many errors highlighted by Lufthansa's expert, the most significant is Castanares' Plaintiff's expert, Baggett's, assumption of 10% interest rate and that interest would accrue the earlier of 7 days after cancellation or a request for a refund. Based on these assumptions Baggett provided an excessively optimistic estimate of what Class Members could recover."); *see also* Amended Order Granting Preliminary Approval, ECF No. 203.

Castanares' damages calculations are also wrong because they assume, incorrectly, that as of today there are 31,190 customers that still have not received refunds who are owed $56.6 million.  Castanares Obj. at 4.  Based on these figures, Castanares calculates that "only 899 out of 31,190 customers in this first group submitted a claim." *Id*.  And, Castanares uses the $56.6 million figure to calculate potential interest damages at trial, again incorrectly using a 10% interest rate "for the current 3-year delay." *Id*.  Every one of these factual assumptions and statements is wrong.  $56.6 million was the amount of outstanding unrefunded tickets *when the Settlement was executed almost two years ago*.  The only reason for two out of the three years' worth of delay is because Castanares' counsel has held up the Settlement for almost two years.  Castanares is directly responsible for these accruing damages.  Further, the amount of unrefunded tickets today is far less than $56.6 million that was outstanding in August 2021.  For instance, as of April 2022, the amount of

unrefunded tickets decreased by over $21 million, from $56.6 million to $35,110,282.47, and from 31,190 bookings to 23,843.  *See* Declaration of John Hogan; ECF No. 135.  Today, the total number of unrefunded tickets is expected to be even lower, as is any putative damages figure.  In any case, the precise figure as of today does not matter, as the Court has already held that the amount provided under the Settlement is reasonable even assuming that $56.6 million was yet to be unrefunded (which was the case when the Settlement was reached).  *See Maree*, 2023 WL 2563914, at *11-12.  Reasonableness is to be judged as of the time the Settlement was reached, and not through hindsight two years later after two years of delay caused by Castanares' counsel.

Further, as the Court previously recognized, the "notice to class members and refund value" provided value to class members.  *See Maree*, 2023 WL 2563914, at *11.  Castanares' counsel has argued extensively that Lufthansa completely shut down all refund channels and issued a companywide policy to not notify class members of entitlements to refunds.  *See* Castanares Plaintiffs' Opposition to Plaintiffs' Motion for Preliminary Approval, ECF No. 117-1, at 8-11 (arguing that discovery showed that Lufthansa "intentionally shut down its refund channels," issued directives that refunds would not be provided to buy time, and "deliberately ensured that there were no proactive external communication to customers about the ability to request a refund") (internal quotations and citations omitted).  With a direct notice campaign consisting of direct mail and email (and reminder notices) and a digital media campaign that resulted in 8,593,820 million online impressions, Class Members benefited from the Settlement both by submitting a claim through the Settlement (to the tune of $1.79 million), and by requesting a refund directly from Lufthansa *after finding out about their ability to do so through the expansive notice campaign*.  *See* Declaration of Dana Boub Regarding Notice to the Class, ECF No.

206-2, at ¶ 15.  This is a concrete benefit to Class Members, resulting in likely millions of dollars being refunded that otherwise would not have been.

Castanares again complains about the claims-made nature of the Settlement, arguing that it "did not have to be on a claims-made basis" because "Lufthansa knows the identity of every class member whose flight was involuntarily cancelled, and has contact information for virtually every one of them."  Castanares Obj. at 5. Again, this is not true, and has been rejected by the Court.  Lufthansa only had direct contact information for roughly 117 thousand class members out of 165,098.  *See* Boub Decl., ECF No. 2, at 2 ¶ 9.  Providing automatic compensation also would deprive class members of the choice between cash and vouchers, and the option to keep their tickets open for future flights.  And, as discussed extensively in the past, the option was not between "claims-made" and "automatic" payments, but rather "claims-made" versus no settlement at all, as Lufthansa would never have agreed to such a structure.  Given the grave danger of failure at class certification and trial, the certainty of the $3.5 million claims-made fund is much better than the uncertainty of potentially obtaining a small damages award at trial that could be far lower than the result achieved here.  *See Maree*, 2023 WL 2563914, at *10 (discussing strength of the case, range of recovery and amount offered by the Settlement, and various valuations of the damages at trial – ranging from $159,730 to Castanares' inflated "maximum valuation" of $19.6 million); *id.* at *8 ("[C]ourts routinely provide preliminary approval for claims-made settlement that contain a reversion.").

Indeed, the Ninth Circuit has recognized that reversion is appropriate when "deterrence is not a goal of the statute" at issue, even in cases resulting in a class *judgment* after a trial on the merits.  *See Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1308 (9th Cir. 1990); *Van Gemert v. Boeing Co.*, 739 F.2d 730, 731 (2d Cir. 1984) (affirming district court decision to revert unclaimed portion of a class action judgment fund to the defendant).  Here, the only cause of action in

both this action and in *Castanares* is one count for breach of contract.  There is no consumer protection statute with deterrence as a goal that would make reversion inappropriate.  Further, the fact that most class members did not submit claims does not mean that they received "nothing" in return for a release of claims.  *See* Castanares Objection at 10.  The Supreme Court has long recognized that class members benefit from the creation of the fund, regardless of whether they ultimately submit a claim.  *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478-481 (1980) ("[Class members'] right to share the harvest of the lawsuit upon proof of their identity, whether or not they exercise it, is a benefit in the fund created by the efforts of the class representatives and their counsel.").  According to Castanares' reasoning, even absent class members that obtained a judgment *after trial* would receive "nothing" if they never submitted a claim to their portion of the judgment.  That argument is foreclosed by *Boeing* and *Six (6) Mexican Workers*.

The rest of Castanares' bullet-point arguments can be summarily overruled, as this Court has considered and rejected all of them in the past:

Settlement Negotiation Process and Putative Collusion: Castanares again claims that the Settlement is the result of collusion and was reached through a "tainted process," that Class Counsel had "no settlement leverage," and that the interests of direct purchasers were not sufficiently represented.  Castanares Obj. at 6, 8.  And, Castanares argues that "[v]irtually every 'red flag' identified by the Ninth Circuit is present in this Settlement."  *Id*. at 7.  This Court conducted an extensive examination of these factors, and disagreed with Castanares.  *Maree*, 2023 WL 2563914, at *5, 7-9.  *See also id*. at *12 n. 3 ("nor does the Court find that the settlement provides preferential treatment to class representatives or segments of the class").  The Court held that "the record before the Court does not permit the Court to conclude that Maree and Lufthansa engaged in collusion that prejudiced the interests of class members," noted that "the settlement was reached through a neutral

mediator, which supports the propriety of the negotiations," and held that "it did not find the traditional subtle signs of implicit collusion." *Id*. at *8.  The Court held that counsel will not "receive a disproportionate distribution of the settlement," and that the "agreement also does not contain a 'clear sailing' arrangement." *Id*.  And, the Court held that any concerns about collusion were alleviated by the "reasonableness of the settlement." *See id*.  Castanares has asserted no new facts or arguments that merit reconsideration of these issues.[4]

Discovery: Castanares again rehashes arguments that the Settlement was purportedly reached "before formal discovery."  Castanares Objection at 8.  Relatedly, Castanares again argues that the discovery that occurred after the Settlement was reached purportedly strengthened class members' claims. *Id*. at 10.  The Court rejected both arguments.  As the Court recognized, "[p]rior to settlement, Maree's counsel engaged in a variety of informal discovery; served, responded, and conferred regarding interrogatories and production of documents; and litigated two motions to dismiss and motion to compel arbitration." *Maree*, 2023 WL 2563914, at *9.  "This procedural history sufficiently demonstrates that Maree's counsel was adequately informed of the merits of the case before engaging in negotiations." *Id*.  Further, the Court held that Castanares' further discovery after Settlement "presented mixed results." *Id*.  "While limited discovery provided evidence demonstrating that Lufthansa may have taken steps to delay refunds, the limited discovery also demonstrated that the potential class was smaller … and that the average times for refunds were between 40 and 140 days." *Id*.  "In other words, while the Castanares

---

[4] Castanares' rehashed argument about the Settlement resolving the claims of a related class action without the involvement and consent of the other cases' representatives sticks out because the objectors here – Jana and Dennis Castanares – are not parties in the *Castanares* action, and they have not demonstrated how they could have been injured from the purported lack of consent from the plaintiffs in the *Castanares* action. *See* Castanares Obj. at 9.  Notably, the named Plaintiffs in *Castanares* **do not object** to the Settlement after holding the Settlement up for two years.

Plaintiffs may have uncovered facts that could strengthen their case in terms of establishing liability, other uncovered facts revealed that damages may have been much lower than what the parties anticipated." *Id*. "These facts support the fairness and adequacy of the substance of the settlement." *Id*.

Strength of Claims:  Castanares again argues that the Settlement "does not reflect the strength" of the claims at issue, and argues that discovery purportedly showed that there was no condition precedent to entitlement to a refund.  Castanares Obj. at 10.  Relatedly, Castanares argues that the Settlement does not account for the differences in the strength of Class Members' claims depending on whether they were direct or indirect purchasers, and depending on what state they purchased tickets in.  *Id*. at 12.  The Court, however, did not believe that *any* class members would do well on the merits.  For instance, the Court "agree[d] that given the backdrop of COVID-19 and the prospect of Lufthansa going bankrupt, there is a serious question as to whether an average refund period of 40, 45, or even 140 days was a reasonable time [to] provide refunds." *Maree*, 2023 WL 2563914, at *10. Further, the Court "recognize[d] that the issues raised by the Maree Plaintiffs and Lufthansa present hurdles for class certification on the merits that could jeopardize ability of the class to recover." *Id*. at *11.  "At a minimum, the briefs demonstrate that class certification would be hotly contested, weighing in favor of settlement." *Id*.  "In light of these litigation hazards, the Court agrees that Class Members would face a long, contentious, and uncertain road to recovery, which weighs in favor of settlement." *Id*.

The differences between direct and indirect purchasers has also extensively been briefed before.  *See id*. at *5.  The claims of direct purchasers were not "stronger."  The motion for arbitration as to indirect purchasers was denied, and was almost certainly going to survive an appeal before the Ninth Circuit.  Further, the indirect purchaser class is more than double in size of the direct purchaser class, so

to the extent that there were differences in the merits of their claims, any differences were offset by the leverage gained through the sheer size (and associated higher damages) of the indirect purchaser class. Ultimately, the results obtained are fair to both sets of class members, as the results are likely *higher* than *either* set of class members could have obtained at trial. Further, as to differences in state law concerning interest, it is far too speculative to state with certainty that class members in one state would have recovered more in interest than class members from different states, as all customers are subject to the exact same contract of carriage. *See* Third Amended Class Action Complaint, ECF No. 93, Ex. 1. More than likely, if this case proceeded, all class members, regardless of what state they resided in, would have recovered *nothing* because the case would not have made it past class certification.

Damages:  Castanares' damages arguments have become more and more strained over time, now arguing that a Settlement reached two years ago should be judged based on potential damages that would have accrued *to date* if the Settlement was not reached at all, instead of damages that existed *at the time of the Settlement*. *See* Castanares Obj. at 11 (discussing 3-year delay). The Settlement provided 1% interest for unrefunded tickets (plus full refunds) as of the time that the Settlement was reached. According to Castanares, the Settlement currently provides .33% interest per annum, because three years have now passed. *Id.* All that goes to show is that Castanares has robbed the Settlement class of .67% interest by delaying the approval of the Settlement by two years. Indeed, given today's higher interest rates, Castanares has in effect deprived class members of 3-5% interest per year that Class Members could have gained by putting the money they received from the Settlement into a certificate of deposit or a high-yield savings account.[5] In effect, the harm Castanares has caused to Class Members by delaying payouts under the Settlement for 2 years may be higher than any damages Lufthansa caused by delaying refunds

[5] Some FDIC insured CD rates are offered above 5% today. https://www.bankrate.com/banking/cds/cd-rates/

between 40-140 days in the first place, as interest rates are far higher today than the near-zero level interest rates that existed in 2020 in the height of COVID-19.

The Court's prior order provided a chart outlining each of the parties' minimum and maximum valuations of damages at trial, with estimates spanning from $159,730 to $19.6 million. *Maree*, 2023 WL 2563914, at *12; ECF No. 198 at 19. The Court explicitly recognized that Castanares' estimates – the same estimates that they provide now – "are too high" and "excessively optimistic." *Id*. The $3.5 million fund here is an outstanding result, regardless of what damages metric is used, considering that if this case went forward there would be a very high likelihood that class members would recover nothing at all.

<u>Adequacy of Class Counsel and the Class Representatives</u>: Castanares repeats arguments concerning the adequacy of Class Counsel and the Class Representatives. *See* Castanares Obj. at 9. The Court has rejected these arguments, and should do so again. *See Maree*, 2023 WL 2563914, at *5. Because the parties have spent seemingly countless pages on these issues, they will not be repeated again herein.

<u>Attorneys' Fees and Incentive Awards</u>: Castanares repeats arguments that Class Counsel's fee request and Plaintiffs' incentive award requests are excessive. *See* Castanares Obj. at 10. These arguments were rejected by the Court at preliminary approval. *See Maree*, 2023 WL 2563914, at *8. Notably, Castanares does not cite a single page of Plaintiffs' Motion for an Award of Attorneys' Fees, Costs, and Expenses, and Incentive Awards, ECF No. 207. The motion is not even mentioned other than in Castanares' argument about the amount of time class members had to object to the motion (addressed below). *See* Castanares Obj. at 14. Castanares makes no argument about any evidence or caselaw cited in support of the motion, the reasonable hours spent by Class Counsel, the reasonableness of Class Counsel's rates, the appropriateness of the common-fund methodology for determining fees, the appropriateness of a lodestar cross-check, the application of a

reasonable lodestar multiplier, or any of the cases cited or arguments made in the motion.

## III.    CASTANARES' "NEW" OBJECTIONS ARE WITHOUT MERIT

### A.    The $500,000 Minimum Floor Is Reasonable

Castanares again object to the Settlement's provision of a $500,000 Minimum Floor because it purportedly would create a windfall for the named Plaintiffs (who submitted claims) and other class members that submitted claims "at the expense of the majority of the class that did not submit claims." Castanares Obj. at 12. These arguments were already rejected by the Court the last time Castanares objected to the $500,000 Minimum Floor. *See* Anthony Castanares, Kristin Sullivan and Jana Castanares' Opposition to Defendant Deutsche Lufthansa AG's Ex Parte Application for Modification of the Preliminary Approval Order; ECF No. 200 (where the *Castanares* plaintiffs, and non-party – and current objector Jana Castanares – objected to the $500,000 Minimum Floor); Amended Order Granting Preliminary Approval of Class Action Settlement, ECF No. 203, at 9 ¶ 26 (approving the $500,000 Minimum Floor).

As an initial matter, there is no "windfall." As discussed above, 18,429 claims have been submitted for $10 cash (for a value of $180,429), 1,941 claims have been submitted for $45 vouchers (for a value of $87,345), and 985 claims have been submitted for 1% interest (for an approximate value of $17,887). The claims for this portion of the Settlement (not counting $1,789,163.85 in claims submitted for full refunds) total $285,661. With the Minimum Floor adjustment to $500,000, class members and Plaintiffs that submitted claims are only receiving a 1.75x adjustment, not even double the value of their initial claim. With the *pro rata* adjustment, class members that selected cash would receive $17.5, class members that selected vouchers would receive $78.75, and class members that applied for 1% interest will receive an average of $31.78 in interest. None of these numbers are a "windfall."

Indeed, Castanares' argument that these payments would be a "windfall" does not square with their simultaneous argument that the claim amounts are not high enough to compensate class members for their damages.  Castanares' further argument that this adjustment is somehow "at the expense of" class members who did not submit claims is nonsensical, as all class members had an opportunity to submit a claim, and the *pro rata* adjustment is not coming out of any share due to any other class member.

Castanares' arguments that a *pro rata* adjustment is inappropriate are completely antithetical to their arguments that the Settlement should have been a literal common fund, and not a claims-made deal.  In any settlement that results in the creation of a literal fund, any unused funds (and there are almost always unused funds) must by definitions be distributed *pro rata* to class members, revert to the defendant, escheat to the government, or be distributed *cy pres*.  *See Six (6) Mexican Workers*, 904 F.2d at 1307, 1307 n. 4 ("Most class actions result in some unclaimed funds.  Having properly found that certification of the class action was appropriate, the district court was require to formulate a procedure for distributing unclaimed funds.  The court's alternatives included: 1) cy pres or fluid distribution, 2) escheat to the government, and 3) reversion to defendants.  A fourth option is the pro rata distribution of the funds to located class members.").  In other words, Castanares argues both for a literal common fund, and argues against elements that are inherent in any common fund.

*Pro rata* distributions of unused funds are routinely approved within the Ninth Circuit.  *See, e.g., In re Google Inc. Street View Electronic Comms. Lit.*, 21 F.4th 1102, 1110-11 (9th Cir. 2021) ("courts have permitted additional pro rata distributions to those class members who did claim funds"); *Rosales v. El Rancho Farms*, 2015 WL 4460918, at *8 (E.D. Cal. July 21, 2015) ("Because there is insufficient evidence to support a determination that Class Members who submitted

claim forms will receive a windfall, the proposed pro rata distribution is appropriate for unclaimed funds."); *Perkins v. Linkedin Corp.*, 2016 WL 613255, at *10 (N.D. Cal. Feb. 16, 2016) (finding settlement reasonable in part because unclaimed funds would be distributed *pro rata* to those class members that submitted claims); *Flores v. Alameda County Indus. Inc.*, 2015 WL 3763605, at *3 (N.D. Cal. June 16, 2015) ("The parties have now agreed to maximize the money delivered to the class by agreeing that unclaimed funds exceeding $10,000 will be distributed on a pro rata basis to the class members who cashed their checks. … This is a good result and the Court appreciates the parties' work to get there."); *Davis v. Brown Shoe Co., Inc.*, 2015 WL 6697929, at *5-6 (E.D. Cal. Nov. 3, 2015) (approving a claims-made settlement that had a $400,000 minimum floor where a low claims rate required a pro rata adjustment up to the minimum floor); *Ontiveros v. Zamora*, 303 F.R.D. 356, 362 (E.D. Cal. Oct. 8, 2014) (approving settlement where any "unclaimed settlement funds will be redistributed to class members on a pro rata basis").

Castanares' cited cases do not suggest that a *pro rata* adjustment of unclaimed funds is not appropriate here. *See* Castanares Objection at 12. In *Miller v. Ghirardelli Chocolate Co.*, 2015 WL 758094, at *10 (N.D. Cal. Feb. 20, 2015), the objector provided "[n]o authority" for the argument that a *pro rata* adjustment was appropriate. The court also was concerned that a *pro rata* adjustment in that case would result in a "windfall" because it would provide claimants with refunds that exceeded their purchase price. Here, even with the 1.75 adjustment, there is no windfall. Indeed, Castanares argues that the amounts provided under the Settlement are *not sufficient*. Castanares' citation to *Willcox v. Lloyds TSB Bank, plc*, 2017 WL 487018, at *2 (D. Haw. Feb. 6, 2017) is puzzling because no one in that case sought a *pro rata* distribution. In that case, the plaintiffs proposed a *cy pres* distribution, but the court ordered that residual funds revert to the defendant. *Willcox*, 2017 WL 487018, at *4. *Hartless v. Clorox Co.*, 273 F.R.D. 630, 642 (S.D. Cal. Jan. 20, 2011)

is also inapposite, as in that case, the claimants recovered "100 percent of their claimed losses," the "damages per individual in this case are modest," and the amount of the unclaimed funds "can be significant in comparison to an individual's property damage." Here, as discussed above, the size of the unclaimed funds is relatively small, the *pro rata* adjustment is modest, and Castanares argues that, if anything, class members should be receiving *more* in light of their putative damages at trial.

### B.    The Notice Was The Best Practicable

In its Preliminary Approval Order, this Court concluded that the Class Notice "will provide the best notice practicable under the circumstances," adequately summarized the terms of the Settlement, advised the Class regarding their rights to object, file claims, and opt out, and otherwise "satisfies the requirements of Rule 23 … due process, and all other applicable law and rules." ECF No. 203 ¶ 8. Citing zero evidence, Castanares contends that "[t]he notice plan ordered by the Court was not carried out by Lufthansa and Maree." Castanares Objection at 13. This is not true. Indeed, the notice plan was *improved* since the Court granted preliminary approval through the provision of reminder notices, which were not part of the initially approved notice plan. The Claims Administrator has provided multiple, detailed declarations explaining how and when the notice plan was carried out. *See* Declaration of Dana Boub Regarding Notice to the Class, ECF No. 206-2; Boub Decl., Declaration of Dana Boub Regarding Notice to the Class, ECF No. 212.

Castanares complain that they did not receive direct notice by email at the outset of the notice campaign. Castanares Objection at 13. But they concede that they did in fact receive direct notice, with more than enough time to prepare their objection and to submit claims.[6] *See id*. Lufthansa has already explained to the Court that Lufthansa "discovered that the e-mail addresses of a small number of

---

[6] Both objectors successfully submitted claims.

settlement class members (approximately one-half of one percent of the total class) inadvertently were omitted from the class member list provided to the claims administrator as a result of a de-duping error in the collection and processing of the claims data." Defendant Deutsche Lufthansa AG's Unopposed Ex Parte Application for Clarification and/or Modification of the Amended Order Granting Preliminary Approval of Class Action Settlement, ECF No. 204, at 1. Upon discovery, "Lufthansa immediately sent direct notice by e-mail to these individuals on May 24, 2023." *Id.* Upon learning of this information, the Court did not believe that any changes were required to the Court's April 21, 2023 Amended Order granting preliminary approval, and left the then-scheduled notice deadlines in place. ECF No. 205. And, as explained by the Claims Administrator, email notice was successful for only 81% of class members for whom it possessed email addresses, which in itself is relatively high considering the rate of mass emails being blocked by email servers today. *See* Boub Decl., ECF No. 206-2, at ¶ 12. The fact that two emails belonging to the Castanares objectors apparently slipped through the cracks on the initial round of notice is entirely consistent with the facts disclosed to the Court. Certainly, it does not show that the Claims Administrator did not carry out the Court-approved notice plan. Indeed, all evidence points to the notice plan having been a tremendous success, with a reported claims rate of nearly 13 percent.

Further, direct notice was not the only form of notice in this case. An expansive digital media campaign resulted in 8,593,820 million online impressions. Boub Decl., ECF No. 206-2, at ¶ 13. As to the Objectors, they clearly learned of the Settlement and in fact received notice.

The Castanares objectors also ask that the Court order the Claims Administrator to disclose how many people opened the email notice. Castanares Obj. at 14. But they cite no caselaw in support of this argument, and do not explain why this data would be relevant or helpful. Notice is not somehow nullified if a

class member receives it but chooses not to open it.  And, the fact that the claims rate is far higher than typical in consumer class action shows that the notice campaign was clearly very effective.  Castanares' speculation that the notice plan was potentially "designed in a way to discourage customers from submitting claims" is further belied by the fact that the Claims Administrator provided reminder notices to all that had not previously submitted a claim.  *See id*. at 14.  The notice process was robust and effective.

### C.    Motion for Attorneys' Fees Was Served 14 Days Prior To Objection Deadline

As discussed above, Castanares' final "new" objection that class members purportedly did not receive at least 14 days to object or opt out after the filing of Plaintiffs' motion for attorney's fees has been mooted.  Castanares Obj. at 14.  After Castanares submitted their objection, the Court extended the objection and opt-out deadlines until 14 days after Plaintiffs' motion was *actually filed*.  *See* Order Granting Plaintiff's Unopposed Ex Parte Application for Continuing the Class Member Objection and Opt Out Deadlines, ECF No. 211.  Accordingly, all class members in fact had 14 days to object or opt out after Plaintiffs' motion for attorney's fees was filed.

## IV.    CONCLUSION

The Settlement is fair and reasonable.  The Court should overrule the Castanares objection, grant final approval, and grant Plaintiffs' motion for fees, costs, and service awards.

Dated:  June 30, 2023                                  Respectfully submitted,

                                                       **BURSOR & FISHER, P.A.**

                                                       By:  ___/s/ Yeremey O. Krivoshey___
                                                              Yeremey O. Krivoshey

                                                       L. Timothy Fisher (CA Bar No. 191626)
                                                       Yeremey O. Krivoshey (CA Bar No. 295032)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
            ykrivoshey@bursor.com

**BURSOR & FISHER, P.A.**
Max S. Roberts (*Pro Hac Vice*)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
Email: mroberts@bursor.com

*Class Counsel*